## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **JOSHUA MAXTON,** | : | **Case No. 1:18-cv-372** |
| **c/o Gerhardstein & Branch Co. LPA** | : | |
| **441 Vine Street, Suite 3400** | : | |
| **Cincinnati, Ohio 45202,** | : | **Judge Michael R. Barrett** |
| | : | |
| **Plaintiff,** | : | **FIRST AMENDED COMPLAINT** |
| **v.** | : | |
| | : | |
| | : | |
| **BILL HILBERT,** | : | |
| **C/O Cincinnati Police Department** | : | |
| **310 Ezzard Charles Drive** | : | |
| **Cincinnati, Ohio 45214** | : | |
| | : | |
| **and** | : | |
| | : | |
| **JEFF GRAMKE,** | : | |
| **C/O Cincinnati Police Department** | : | |
| **310 Ezzard Charles Drive** | : | |
| **Cincinnati, Ohio 45214** | : | |
| | : | |
| **and** | : | |
| | : | |
| **CITY OF CINCINNATI** | : | |
| **801 Plum Street** | : | |
| **Cincinnati, OH 45202** | : | |
| | : | |
| **Defendants.** | : | |

## I.    PRELIMINARY STATEMENT

1.      This civil rights case challenges the detention of Joshua Maxton without probable cause

for a period of seven months.  Despite losing probable cause to continue to detain Mr. Maxton,

the Cincinnati Police Department and two of its officers buried evidence of his innocence and

caused him to be held for months and prosecuted him for a murder he did not commit.

2.      In June 2015, Mr. Maxton was an innocent bystander to the fatal shooting of eighteen-year-old Robin Pearl.  Ms. Pearl was shot and killed while in the passenger seat of a parked SUV, with the driver of the car the intended victim.  Charged with murder less than 24 hours after the shooting, Mr. Maxton was finally acquitted of the murder nearly a year later, after his defense counsel surprisingly uncovered the DNA evidence Defendants had kept hidden during trial.

3.       Soon after Mr. Maxton's arrest, the Defendants realized their case against him was unraveling.  Numerous eyewitnesses had come forward to identify another man -- Donte Foggie -- as the lone shooter; another eyewitness described the shooter as a person who did not match Mr. Maxton's description, but did describe Foggie; and no witness ever identified a motive for Mr. Maxton to shoot at the intended victim, Quinn Brown, who was the driver of the car in which Ms. Pearl was killed.  Equally problematic for Defendants' case against Mr. Maxton was the fact that Mr. Brown (who had reason to fear additional violence from the real assailant) repeatedly changed his original story implicating Mr. Maxton, and forensic analysis conducted at Defendants' request found no trace of gunshot residue on Mr. Maxton's hands or clothing nor any other forensic evidence tying Mr. Maxton to the shooting.

4.      Then, in September 2015, Defendants learned that DNA analysis had definitively excluded Mr. Maxton as the man whose saliva was left on a soda can dropped at the scene of the crime.  And four weeks later, Defendants learned, through a search of the DNA database, the identity of the actual source of the DNA on the dropped soda can: Donte Foggie.

5.      All of this DNA evidence was suppressed by Defendants. It was profoundly exculpatory, and Defendants knew it.

6.      Defendants were fully aware that Foggie was the prime alternate suspect in the case well before they obtained this exculpatory DNA evidence, and that it was critical to Mr. Maxton's defense. While the case against Mr. Maxton had gotten flimsy, prior to the DNA evidence, it still came down to witness credibility. In the absence of physical evidence, the sole question was whose eye-witness testimony was to be believed. DNA evidence exculpating Mr. Maxton and inculpating Foggie destroyed any remaining probable cause that Mr. Maxton had shot Robin Pearl. And unlike Mr. Maxton – who had no animosity whatsoever towards the victim or her companions, and no motive to harm them – Foggie *did* have a well-known motive for the killing. Foggie had an ongoing "blood feud" with the driver of the vehicle (who was sitting inches from the victim at the time Foggie shot her), with whom he had previously committed violent crimes, and who Foggie feared might kill him if he did not strike first.

7.      Defendants' withholding of this material DNA evidence resulted in Mr. Maxton's continued unlawful detention and malicious prosecution. Had the evidence not been uncovered during trial, Mr. Maxton could be spending life in prison for a murder he did not commit.

8.      Plaintiff brings this suit to seek fair compensation for his lengthy pretrial incarceration and emotional distress in risking his freedom on a jury verdict. He also seeks reforms that ensure that in the future, innocent persons like him are not detained and prosecuted after the police know probable cause has evaporated. The reforms that Plaintiff seeks will not only vindicate the rights of other innocent persons accused of crimes, but also serve to protect the public at large. As evidenced by this case, when an innocent person is wrongly detained and prosecuted for crimes he did not commit, the real assailant too often remains at large and a danger to others. Indeed, nearly two years after the DNA evidence and eyewitness testimony implicating Foggie was made public, Defendants have yet to charge anyone with Ms. Pearl's murder.

## II.  JURISDICTION AND VENUE

9.      Jurisdiction over the federal civil rights claims is conferred on this Court under 28 §§ U.S.C. 1331 and 1343(3) and (4).

10.     Jurisdiction over the state law claims is conferred by 28 § U.S.C. 1367(a).

11.     Venue is proper in this division.

## III.  PARTIES

12.     Plaintiff Joshua Maxton was at all time relevant to this action a resident of Hamilton County.

13.     Defendant Bill Hilbert is a Detective with the City of Cincinnati Police Department. Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is sued in his individual and official capacity.

14.     Defendant Jeff Gramke is a Sergeant with the City of Cincinnati Police Department. Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is sued in his individual and official capacity.

15.     Defendant City of Cincinnati is a unit of local government organized under the laws of the state of Ohio.  Defendant City of Cincinnati is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.

## IV.  STATEMENT OF FACTS

16.     In June 2015, Joshua Maxton was twenty-six years old.  He was wrongly accused of a murder he did not commit, spent a year in jail prior to trial, and risked his freedom to fight the criminal charges against him.  It took him a year to prove to a jury he was not guilty of shooting Robin Pearl.

## THE SHOOTING

17.     On the evening of June 15, 2015, Joshua Maxton saw a red GMC Terrain SUV drive down Burton Avenue in Cincinnati, Ohio.  He knew the SUV driver, Quinn Brown.  Brown stopped in the middle of the street to say hello.

18.     Brown parked in front of 920 Burton Ave, heading Northwest.  The apartment building at 920 Burton is U shaped with a courtyard in the center of the U.  A chain link fence with an open gateway in the middle encloses the courtyard.  (Exhibit 1).

19.     Families were socializing in the park across the street, to the left or West of the driver's side of the SUV.  On the right/passenger side of the SUV was the apartment building at 920 Burton.  The closest building entrance to the SUV was only a few yards away.  The courtyard was behind the vehicle and to the right.

20.     Joshua Maxton walked over to Brown's SUV and leaned against the passenger side's open window to talk with Brown, with whom he was acquainted and had a friendly relationship.  There were two other people in his vehicle.  Mr. Maxton didn't know them, but they were Robin Pearl, in the front passenger seat, and Cormon Harriell, in the back-driver side seat.

21.     Brown asked for a cigarette, so Mr. Maxton turned away from the vehicle to walk over to the apartment building at 920 Burton to try to buy one cigarette from "the candy lady" – a resident who was known to sell loose cigarettes and other items from her apartment.  Her window was directly behind and perpendicular to where he had been standing next to the vehicle.

22.     As Mr. Maxton walked away toward the candy lady's window, Donte Foggie exited the building at 920 Burton from a door behind the SUV, and was seen standing inside the fenced-in courtyard.

23.     Mr. Maxton then walked back to the passenger side window of the SUV.  He told Brown the candy lady didn't have any cigarettes, and they shook hands and exchanged goodbyes.  Mr. Maxton left a palm-print on the front passenger side door near the outside rear view mirror as he leaned in to shake Brown's hand.

24.     Before he could turn to leave, Mr. Maxton heard gun shots and ducked down.

25.     According to witnesses whom police interviewed only after Mr. Maxton's arrest, Donte Foggie was standing in the courtyard when he pulled out a gun and began shooting.  The first shot was in the air.  He then began to yell obscenities at the SUV, suggestive of his pre-existing feud with Brown.

26.      As Foggie walked in the direction of the SUV and approached the curb, he shot again, this time at the car.

27.     A bullet shot through the back-passenger window of the SUV at a sharp angle, through the front passenger headrest, and into the back of Robin Pearl's head. Ms. Pearl died as a result of the single gunshot wound.

28.     The angled flight path of the bullet placed the shooter at the *back*-passenger side of the SUV – not the *front* passenger side, where Mr. Maxton stood the entire time he interacted with the car's occupants (Exhibits 5 and 6).

29.     At 7:50 pm, a 911 call alerted the Cincinnati Police Department ("CPD") to the shooting. The caller gave his name as "Tay, Donte," and the caller twice stated that he did not see who shot the victim.  Police would later determine that the call was placed by Cormon Harriell (the passenger in the rear of the vehicle), who falsely gave his name as "Donte."

30.     Officers Andrew Fusselmam and Andrew Burkett were dispatched to the location of the SUV, which had driven away from the scene of the shooting and stopped around the block at the intersection of Dana Avenue and Dakota Avenue.

31.     By 7:52 p.m., the police officers arrived at the Dana Ave. location and found Ms. Pearl's body inside the SUV.  Once the responding officers realized Dana Ave. was not the scene of the shooting, more officers were dispatched to the area around 920 Burton Ave.

32.     At the Dana location, officers put up crime scene tape, and questioned the surviving occupants of the car, Brown and Harriell.  The two witnesses were questioned together at first, then were separated and questioned in separate police cars.

33.     During his questioning, Brown did not tell officers the identity of the shooter.  He was afraid to finger Foggie, with whom he had an ongoing and longstanding feud arising from criminal activity they had committed together (and for which both had served prison time) over a decade earlier.

34.     Defendant Det. Hilbert briefly questioned Brown, then went to the Burton Avenue scene with Det. Gregory.

35.     Brown and Harriell were transported to homicide.  Brown was in Officer Fusselman's vehicle.  While in transit, Brown pointed out a man on the side of the road and told Fusselman "that's him."  The man he claimed shot at him from behind was Mr. Maxton, who at that time was walking calmly down the street, unafraid of a police vehicle.  Fusselman arrested Joshua Maxton at 9:01 pm.

## THE INVESTIGATION QUICKLY POINTS AWAY FROM JOSHUA MAXTON AND TOWARD A SUSPECT DEFENDANTS IGNORE

36.     At the Burton Avenue scene, officers put up crime scene tape and looked for evidence twice, once the night of the shooting and then again, the next day.  That night, they found broken

glass in the street, where the SUV window had been shot out.  The glass was marked by placard "C." (Exhibit 2).[1]  They found a spent casing in the grass between the two sidewalks.  The casing was marked by placard "A." (Exhibit 2).

37.     The officers also found a discarded Big K Cola soda can at the scene.  The can was photographed and recovered directly adjacent to where the back-passenger window of the vehicle was when it had been parked.  The can was marked by placard "D." (Exhibit 3).[2]

38.     Shortly after 8:30 pm, Detectives Bill Hilbert and Dave Gregory began their investigation.  They were joined by Criminalists Tim Gormly and Denise Burns.

39.     The Criminalists documented both scenes, including diagraming the scenes, taking photos, and collecting evidence, including the spent casing and the soda can.

40.     Notably, the can was in the flight path of the bullet that killed Ms. Pearl.  A clear path is created between the first shot (daytime placard D, casing found in courtyard the next day) (Exhibit 4), the second shot (placard A, casing found in grass outside courtyard) (Exhibit 2), the can (nighttime placard D) (Exhibits 2 and 3), and the broken glass (placard C, found in street) (Exhibit 2).

41.     Joshua Maxton is a 5' 3" tall Black male with a compact build.  That night he was wearing a white hockey jersey, black shorts, and white shoes.  He has distinctive chess piece tattoos on his face.

42.     At the Burton Avenue scene, Det. Hilbert and Det. Gregory canvassed for witnesses.

---

[1] Placard B on Exhibit 2 was found not to be evidence related to the shooting.
[2] The can is also visible in Exhibit 2, but the placard has not been placed yet.

43.     Gregory spoke to witness K.G., who had been in the park.  She identified a shooter she saw shoot twice into the air.  She said it had been a Black man, 5' 10", 150 pounds, wearing a fisherman's hat, a gray shirt, and army fatigue shorts.  She did not describe Joshua Maxton.

44.     According to Det. Hilbert, he interviewed a few people in the area, but they did not have any useful information.

45.     Defendant Det. Hilbert and another detective returned to homicide to interview Brown, Harriell, and Mr. Maxton.

46.     In his second police interview, although he had previously told police that same evening that he knew the shooter's identity but refused to identify him, Brown identified Mr. Maxton as the shooter.  However, Defendants knew his identification was weak since he said he never saw a gun in Mr. Maxton's hands, he did not know where the gun could have come from, and he could not identify any motive for Mr. Maxton to shoot at him or anyone else in the vehicle.  Because Brown and Mr. Maxton knew each other, Defendants did not do a line-up.

47.     In Harriell's interview he identified Mr. Maxton as the shooter by description, including his clothes and his tattoos.  He thought Brown and Mr. Maxton's conversation seemed normal.  He had no idea what would have motivated Mr. Maxton to shoot at Brown.

48.     At a line-up, Harriell identified Mr. Maxton and said he was the shooter.

49.     Brown and Harriell both identified Mr. Maxton, but neither actually claimed to have seen Mr. Maxton with a gun or to have seen him shoot a gun.  Neither was able to attribute a motive to Mr. Maxton.

50.     Quinn Brown was afraid to finger Foggie.  It was well known that Brown had a long feud with Foggie and had himself been shot multiple times since his release from prison.  And while

9

Harriell had no personal history with Foggie, he notably gave the false name "Tay, Donte" when he called 911 immediately after the shooting.

51.     When asked by police about his initial false statement, Harriell stated that he gave the false name because he did not want to "get involved" with the police investigation.  He further claimed that he came up with the name "Donte" only because it was his father's name.

52.     Even after eyewitnesses informed police in the days following the murder that Donte Foggie was at the scene, had a gun, and shot at Brown's SUV while walking in the direct path where the shell casings were recovered, at no time did Defendant Hilbert or any other CPD officer ask Harriell if the real reason he gave the name "Donte" was because he knew or suspected that Foggie was the shooter.

53.     Early in the morning of June 16, 2015, around 1 a.m., Defendant Hilbert and Det. Gregory finally interviewed Mr. Maxton.  At that point, Mr. Maxton had already been in custody for approximately four hours.  He had already been waiting, handcuffed, in the interrogation room for two hours.  He declined to answer their questions.

54.     The criminalists swabbed Mr. Maxton's hands and clothes so that they could be tested for gunshot residue ("GSR").  Mr. Maxton was in handcuffs and not permitted to wash his hands the entire time between his arrest near the scene and when he was swabbed for GSR testing.

55.     The morning of June 16, 2015, Defendant Hilbert continued his investigation.  He interviewed a bus driver who had been in the area.  Defendant Hilbert learned the surveillance camera on the bus should have recorded the vicinity of the shooting but Defendant Hilbert never secured the video evidence.

56.     Another criminalist went back to the scene to do a daytime search.  Another casing was found.  This one was discovered by the groundkeeper at the apartment building.  He had thrown

it in the trash, but pointed out where he had found it.  The casing was photographed and marked with placard "D" during the investigation the next day. (Exhibit 4).

57.     On June 17, 2015, Defendant Hilbert was told there were additional eyewitnesses to the shooting with information and who were willing to cooperate with the ongoing investigation.

58.     Defendant Hilbert interviewed witness L.M. who told him told that Donte Foggie was the shooter.

59.     S. W. told Defendant Hilbert that a man in a fishing hat and camo shorts that she referred to as "Tae" was firing at the vehicle.

60.     As a result of these statements, Defendant Hilbert called Brown and reinterviewed him.

61.     On June 17, 2015, only after being confronted with eyewitness accounts of Foggie firing gunshots at the scene, Brown changed his story for the first time.  He now admitted that Donte Foggie had been at the scene of the shooting; however, Brown insisted that Foggie did not fire any shots, and maintained that Mr. Maxton was the lone shooter.

62.     Despite obtaining new, credible information in the days after Mr. Maxton's arrest that two neutral eyewitnesses saw Foggie shooting at the vehicle, Defendants ignored Donte Foggie as a suspect.

63.     On July 13, 2105, the crime lab report on the swabs collected from Mr. Maxton's hands and clothing came back negative for gunshot residue – in other words, these highly sensitive chemical tests found no trace of gunshot residue on Mr. Maxton's hands or clothes.

64.     On August 31, 2015, the crime lab firearms report found that the two bullet shell casings, one found in the fenced-in courtyard, and one found outside the courtyard, were from the same weapon.

65.     Despite learning about this unimpeachable forensic evidence casting serious doubt on Joshua Maxton being the shooter, Defendants continued to ignore Donte Foggie as a suspect and continued to exclusively pursue murder and other felony charges against Joshua Maxton.

**THE DNA EVIDENCE EXCLUDES JOSHUA MAXTON AND IDENTIFIES IGNORED SUSPECT DONTE FOGGIE**

66.     On September 11, 2015, the Hamilton County Crime Laboratory ("HCCL") issued its initial written report on the serology and DNA testing it had conducted to date on items from the crime scene.  The report was specifically addressed to Defendant Hilbert and was authored by William R. Harry, a forensic scientist at the HCCL.

67.     Upon information and belief, all of the tests conducted by HCCL in this case were at the direction or request of Defendant Hilbert or persons at the CPD working on the investigation under his supervision as the lead detective.

68.      The September 11, 2015 DNA report that was transmitted to Defendant Hilbert stated clearly that none of the items from the crime scene contained Mr. Maxton's DNA.

69.     The crime lab excluded Mr. Maxton as a contributor to the DNA tested.  This included, most notably, the DNA test results obtained from saliva swabbed from the soda can found in the area directly adjacent to the rear passenger side of the SUV and along the apparent bullet trajectory.  The report clearly stated that Mr. Maxton was not the source of the saliva from this soda can, and that the profile was from a male who (at that time) was unidentified.

70.     Crime laboratory records reflect that William Harry – who performed the DNA testing on the soda can – spoke with Det. Hilbert personally on September 11, 2011, *i.e.,* the same day the DNA report excluding Mr. Maxton as the source was issued.

71.     Det. Hilbert was, at that time, fully aware of the exculpatory nature of these DNA test results, and, specifically, the relevancy of the soda can to establishing the shooter's identity.

Indeed, in this same September 15th conference with Mr. Harry, Det. Hilbert attempted to minimize the significance of the results by falsely informing Mr. Harry that there was a "second unidentified shooter involved" in the crime.

72.    In fact, as Det. Hilbert well knew, the evidence gathered by the CPD as of September 11, 2011 overwhelmingly established that there was only one shooter involved in Ms. Pearl's murder.  Moreover, that shooter was not "unidentified," but had been specifically identified by neutral eyewitnesses as Donte Foggie.  At the time he learned of the DNA results, Det. Hilbert had also been aware for nearly two months that the tests for gunshot residue on Mr. Maxton's hands and clothing were all negative.

73.    The September 11, 2015 crime lab report addressed to Det. Hilbert specifically noted that the unidentified male DNA profile from the soda can "have been entered into the local CODIS database."

74.    CODIS is a national database maintained by the FBI containing millions of DNA profiles from convicted persons, arrestees, and crime scenes nationwide.  Accredited government DNA laboratories, including the HCCL, may directly upload DNA profiles from crime scenes into CODIS to be compared to DNA profiles on the local, state, and/or national level.

75.    Upon information and belief, CODIS regulations prohibit laboratories from searching profiles recovered from crime scenes in the database unless, based on information obtained from law enforcement sources, the laboratory has a reasonable basis to believe that the DNA profile in question may have come from the perpetrator(s) of a crime under investigation.

76.    On October 8, 2015, the DNA sample from the soda can was uploaded to CODIS in an attempt to identify the shooter.

77.     Six days later, the CODIS results came back, showing that Donte Foggie's DNA was on the discarded soda can.  Foggie's DNA profile was already in the CODIS database because of his prior felony convictions and arrests.

78.     As a direct result of the CODIS hit identifying him as the shooter who had deposited the soda can at the scene, Foggie was listed in the laboratory case file as an "involved person" at this time.

79.     In October 2015, it was HCCL laboratory policy to immediately transmit any CODIS "hits" (suspect identifications) to the law enforcement agency that had submitted the DNA evidence for testing.  The purpose of these immediate notifications was to ensure that law enforcement could promptly investigate any leads generated by the identification of new suspect(s), clear suspects who did not commit the crime, and potentially arrest and charge the newly identified suspect.

80.     In homicide cases, HCCL's specific practice as of October 2015 was to transmit the CODIS hit notification to the sergeant in charge of the homicide unit – at that time, Defendant Sgt. Gramke – by electronic mail, to ensure prompt transmission and maintain a record that the information had been provided to law enforcement.

81.     Sgt. Gramke learned of the CODIS search results in this case on or about October 14, 2015, when the crime lab emailed him the CODIS results revealing that the DNA belonged to Donte Foggie.

82.      Despite knowing that the DNA results provided objective, scientific evidence corroborating prior eyewitness accounts placing Donte Foggie at the back-passenger window of the car, where the bullet went through the window, and in line with the bullet flight path,

Defendants continued to ignore Donte Foggie as a suspect and continued to pursue murder and other felony charges exclusively against Joshua Maxton.

83. Soon after, Sgt. Gramke informed Defendant Hilbert that Foggie's DNA was on the can found at the shooting. It was the policy of the Cincinnati Police Department to have the CODIS hits reported to Sgt. Gramke, and for him to pass the information to the detective responsible for the case, in this case, Det. Hilbert.

84. However, upon information and belief, the Cincinnati Police Department did not take reasonable measures to adequately train or supervise its sergeants and detectives to ensure that they timely provided exculpatory DNA test results and CODIS identifications to either the Hamilton County Prosecuting Attorney or to defense counsel.

85. Defendants concealed the DNA finding from defense counsel until the 5th day of Mr. Maxton's criminal trial, more than seven months later.

86. Even then, Defendants did not voluntarily disclose the information. Instead, it came to light only as a result of the defense's cross-examination of another crime laboratory scientist who did not conduct the DNA testing (but who had access to the records of all tests conducted by the HCCL), at which time Defendants were forced to concede that the laboratory had obtained these DNA results and transmitted them to Sgt. Gramke seven months before Mr. Maxton's trial.

87. On October 21, 2015, Donte Foggie was listed as an involved person on the gunshot residue crime laboratory report. Defendants received a copy of the report. Foggie was added as an involved person because his DNA had been identified on the cola can at the shooting, and pursuant to HCCL policy, any individual whose biological sample is submitted, tested, or identified during the investigation is automatically listed on future lab reports.

88.     Also, on October 21, 2015, a witness named O.J. was arrested on unrelated charges and told officers he had information about the shooting for Robin Pearl.

89.     Defendant Hilbert interviewed O.J. that day.  O.J. identified Foggie as the shooter.  O.J. said he saw Foggie shoot his first shot into the air and O.J. asked Foggie what he was doing. Foggie said that the driver was the "motherfucker who [was] trying to kill me."  As the vehicle pulled off toward the intersection at Reading Road, Foggie shot again at the car.  O.J. told Defendant Hilbert he never saw Mr. Maxton shoot, nor did he ever see a gun in Mr. Maxton's hands.  He specifically told Det. Hilbert "I know [Maxton] didn't shoot that girl."

90.     Despite knowing the credible, newly discovered eyewitness account that Donte Foggie, not Mr. Maxton, was the shooter, and the unimpeachable DNA evidence showing that Foggie deposited his soda can directly in the bullet trajectory path, Defendants ignored Foggie as a suspect and continued to exclusively pursue murder and other felony charges exclusively against Joshua Maxton.

91.     Clearly the CODIS hit was material evidence as of October 21, 2015, especially when viewed in relation to the evidence as a whole, since this physical evidence directly corroborated all the exculpatory eyewitness evidence in favor of Mr. Maxton.  The CODIS hit became even more material when additional exculpatory evidence surfaced the next day.

92.     On October 22, 2015 – four months after the crime, but less than a week after obtaining the DNA results implicating Foggie – Defendant Hilbert interviewed the SUV driver, Brown, again.  Brown changed his story for a second time.  For the first time, Brown admitted that not only was Foggie present at the crime scene, but he personally saw Foggie shoot at his car -- despite having previously denied seeing Foggie fire any shots.   Brown claimed that Mr. Maxton

was also shooting, despite having made no statements in the four months since the crime indicating that there were two shooters involved.

93.     On October 28, 2015, Defendant Hilbert finally interviewed Donte Foggie, who – predictably – denied shooting Ms. Pearl.  Despite Defendant Hilbert finding Foggie "untrustworthy," and knowing that multiple eyewitness accounts identified Foggie as the lone shooter, and the fact that Foggie's DNA was found on the soda can in the flight path of the bullet that Hilbert had previously traced to an "unidentified shooter," Hilbert released Foggie.

94.     Despite knowing all the inculpatory evidence against Foggie and exculpatory evidence in favor of Mr. Maxton, Defendants ignored Foggie as a suspect and continued to exclusively pursue murder and other felony charges against Joshua Maxton.  It was reasonably foreseeable that these Defendant officers' actions concealing the DNA test results and CODIS evidence would cause Mr. Maxton's continued detention and risked subjecting him to a wrongful conviction and potential life imprisonment for a murder he did not commit.

**THE UNLAWFUL CONTINUED DETENTION OF JOSHUA MAXTON**

95.     When Joshua Maxton was first arrested on June 15, 2015, there was probable cause to support his arrest. Brown and Harriell, the surviving victims, had both identified him as the man they claimed was the shooter.

96.     However, the already tenuous case against Mr. Maxton almost immediately began to collapse as (1) new, third-party witnesses came forward, (2) the surviving victims gave changing and remarkably inconsistent statements about the crime, and (3) forensic testing exculpated Mr. Maxton and implicated Donte Foggie.  With each passing month as Joshua Maxton languished in jail, unable to make bond on murder charges, the case became weaker, until it completely fell apart with the return of the DNA evidence in September and October 2015.

97.     Brown and Harriell were, understandably, highly traumatized by the death of Ms. Pearl inches from where they were sitting, and fearful of continued retaliation from Foggie.

98.     Every witness besides Brown and Harriell had a clear view of the shooter and identified him as a taller man with a fisherman's hat and camo shorts.  Some of them identified Foggie by name.

99.     Brown should have been eliminated as a credible witness the second time he changed his own story in October 2015.  As experienced homicide investigators, Defendants were well aware that Brown had good reason to be afraid to candidly identify Foggie.  This was not the first attempted shooting of Brown since his release from prison, nor the last.

100.    Most crucially, Defendants withheld from Mr. Maxton's defense attorneys that Donte Foggie's DNA was the sole male profile found on the soda can on the ground behind the passenger side window, in the flight path of the bullet shot into the SUV.  This key evidence eviscerated what little remained of the Defendants' already shaky case against Mr. Maxton, especially since Foggie had already been identified as the shooter by multiple people.

101.    On October 14, 2015, when the Defendants received the DNA CODIS hit on Foggie, they lost all probable cause that Joshua Maxton had committed a crime.

102.    Knowing that probable cause evaporated, Defendants concealed the DNA evidence and forced Joshua Maxton to remain in jail for an additional seven months awaiting trial.

103.    During those seven months Joshua Maxton refused all plea bargains and risked taking his case to a jury because he knew he was innocent.

104.    Mr. Maxton spent those seven months before trial worried he would lose at trial and be sentenced to life in a maximum-security prison.  Despite that risk, he could not bear to face his family or live the rest of his life as a confessed murderer.

18

105.    Both prior to and after Defendants received the CODIS hit report excluding Mr. Maxton and implicating Foggie on October 14, 2015, Mr. Maxton's defense counsel made numerous requests for discovery of exculpatory evidence to which their client was entitled under the Ohio Rules of Criminal Procedure and *Brady v. Maryland,* 373 U.S. 83 (1963), and its progeny.

106.    Mr. Maxton's defense counsel also made numerous specific requests to the trial prosecutors for information gathered during the investigation relating to Donte Foggie. The Hamilton County Prosecuting Attorney, ("HCPA") was well aware as of October 2015 that Mr. Maxton's likely defense to the murder charge was that Donte Foggie was the actual assailant.

107.    Mr. Maxton's counsel reasonably relied on the HCPA and the CPD to honor their constitutional obligations to discover and disclose all such information, particularly exculpatory information, with or without these specific requests.

108.    It has been well established for more than two decades that state prosecutors have an affirmative "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police," and to promptly disclose all such evidence to defense counsel.  *See  Kyles v. Whitley,* 514 U.S. 419, 437 (1995).  Since the Defendants knew that the HCPA was legally obligated to immediately disclose any exculpatory evidence, particularly DNA evidence implicating Foggie, to defense counsel, Defendants concealed the DNA test results and CODIS results from the HCPA as well as from defense counsel.

109.    On May 25, 2016, Mr. Maxton went on trial for the murder of Robin Pearl.

110.    In its opening statement, defense counsel asserted to the jury that Mr. Maxton did not commit the murder and played no part in it.  The defense further told the jury in opening

statements that Donte Foggie was the actual killer, with Ms. Pearl the unintended victim of what the defense called a "blood feud" between Foggie and Quinn Brown.

111.    On May 31, 2016, a week into the trial, the prosecutors and Mr. Maxton's defense counsel discovered for the first time the DNA exclusion of Mr. Maxton and the CODIS hit on Donte Foggie's DNA.

112.    This evidence was discovered following the testimony of Emily Weber, a trace evidence examiner from the Hamilton County Coroner's Office, who was testifying about the gunshot residue reports. There were two, one from July 13, 2015, and another from October 21, 2015, and the latter one had Donte Foggie's name on it as a "subject."

113.    When defense counsel for Mr. Maxton inquired during trial why Foggie's name was listed as a subject on the GSR report – since his hands had never been swabbed for gunshot residue – an inquiry was made by Ms. Weber to the HCCL during a break in the proceedings. At that time, it was discovered that Defendants had obtained a DNA report excluding Mr. Maxton as the source of the saliva on the soda can in September 2015, and a CODIS hit to Foggie in October 2015. It was only then – mid-trial, and seven months after Defendants were told about this evidence -- that it was disclosed to prosecutors and defense counsel.

114.    At trial, William Harry, a serologist and DNA analyst from the Hamilton County Coroner's Office, testified that Sgt. Gramke was emailed the CODIS hit results on October 14, 2015.

115.    Sgt. Gramke received the CODIS hit on Foggie on or about October 14, 2015. As per City of Cincinnati policy, practice and custom, Sgt. Gramke informed Det. Hilbert of the DNA results on that same date.

116.    As of October 14, 2015, Defendants Gramke and Hilbert knew all the evidence that implicated Foggie as the shooter and exculpated Mr. Maxton as the shooter.  This knowledge, coupled with their knowledge of Foggie's DNA on the soda can left in the path of the shooting, demonstrates that Defendants knew they no longer had probable cause to continue to detain, nor prosecute Joshua Maxton.

117.    Defendants' failure to disclose the exculpatory DNA evidence to the prosecutor or defense counsel, their failure to release Joshua Maxton, and their insistence to prosecute him without having probable cause, was unreasonable, reckless, extreme, outrageous, and deliberately indifferent.  Additionally, Defendants made, influenced, or participated in the decision to prosecute.

118.    Upon information and belief, Mr. Maxton's case was not the only homicide investigated by the Cincinnati Police Department and prosecuted by the HCPA during this time period in which exculpatory evidence in the form of DNA test results and a CODIS identification of another individual was not disclosed to a criminal defendant until trial.  That same constitutional violation occurred in at least one other homicide prosecution which went to trial in June 2016, in the case of a defendant named P.W. (Unlike Mr. Maxton, Mr. W. was ultimately convicted of the crime notwithstanding the exculpatory evidence that was belatedly disclosed, and he is appealing his conviction.)

119.    On June 2, 2016, Joshua Maxton was acquitted of both counts of murder.  The jury deadlocked on the count of felonious assault.  The charge of felonious assault was dismissed by the court on June 7, 2016.

120.    Defendants acted in complete disregard for the constitutional rights of the accused, Joshua Maxton, and in disregard of the safety of the public in failing to timely disclose the

exculpatory DNA evidence or investigate Donte Foggie, whom the evidence implicated.  As a result, the person who murdered Robin Pearl is still at large.

## THE UNCONSTITUTIONAL POLICIES, TRAINING AND SUPERVISION OF THE CITY OF CINCINNATI

121.    At all times relevant to this action, Defendants Hilbert's and Gramke's actions were negligent, reckless, wanton, willful, knowing, intentional, unreasonable, extreme, outrageous, and deliberately indifferent to the constitutional rights of Joshua Maxton.

122.    Defendants Hilbert's and Gramke's unconstitutional actions violated clearly established law.

123.    At the time Defendants Hilbert and Gramke violated Joshua Maxton's constitutional rights, the City of Cincinnati's policies, practices or customs did not require Defendants Hilbert and Gramke to timely inform Mr. Maxton's defense counsel or the prosecutors the results of the DNA testing and CODIS search, the addition of Donte Foggie as an involved person, or the fact that the prosecuting officers no longer had probable cause to detain or prosecute Joshua Maxton.

124.    At the time Defendants Hilbert and Gramke violated Joshua Maxton's constitutional rights, the City of Cincinnati failed to adequately supervise and train Defendants Hilbert and Gramke to timely inform Mr. Maxton's defense counsel and/or the prosecutors the results of the DNA testing and CODIS search, the addition of Donte Foggie as an involved person, or the fact that the prosecuting officers no longer had probable cause to detain or prosecute Joshua Maxton.

125.    The City of Cincinnati has a policy and practice of failing to adequately train and supervise police officers, sergeants, investigators, and other personnel to timely inform the prosecutor and/or criminal defense attorneys of exculpatory evidence and evidence that there was no longer probable cause to detain or prosecute a criminal defendant.

126.     The City of Cincinnati's unconstitutional policies, inadequate training and supervision of Defendants Hilbert and Gramke was caused by the City's deliberate indifference to the constitutional rights of Joshua Maxton to liberty and were the moving force behind Defendants Hilbert's and Gramke's violation of Joshua Maxton's constitutional rights.

## INJURIES

127.     As a result of Defendant officers and the City of Cincinnati's actions, Joshua Maxton spent nearly a year in jail.  He suffered serious emotional harm, fear for his safety while in jail awaiting trial, and constant worry that he might be condemned to spend the rest of his life in a maximum security prison for a crime he did not commit.

128.     Defendants' actions were the proximate cause of this injury.

129.     Defendants Hilbert and Gramke knew or should have known that their actions, causing the prosecution of an innocent man, jailing him for a year, and risking a lifetime of incarceration, would result in emotional distress.

130.     During his time in jail, corrections officers treated him as guilty even though he had not been convicted.  They taunted him about the lengthy prison sentence they expected him to receive and the mistreatment and assault he would endure in prison.  They even encouraged and provoked violence against him in the jail.

131.     Because Mr. Maxton continues to be vulnerable to investigation and arrest by the Cincinnati police, he is concerned that any future charges filed against him by any Defendant will result in the same concealment of exculpatory evidence.

## V.     FIRST CAUSE OF ACTION – CONTINUED UNLAWFUL DETENTION (42 U.S.C. § 1983)

132.     Defendants have, under color of law, deprived Mr. Maxton of rights, privileges, and immunities secured to him by the Fourth Amendment to the United States Constitution including the right to be free of unreasonable seizures and seizures without probable cause.

133.     When the DNA sample from the soda can found in the trajectory of the gun shots that killed Robin Pearl resulted in a CODIS hit on a person who was not the Plaintiff, and who was in fact the defense's alternate suspect in the crime and who had already been identified as the shooter by multiple eyewitnesses, Defendants lost probable cause to continue his incarceration.

134.     Continuing to incarcerate Plaintiff without probable cause was not the action of an objectively reasonable officer.

## VI.     SECOND CAUSE OF ACTION – MALICIOUS PROSECUTION (42 U.S.C. § 1983)

135.     A criminal prosecution was initiated against Plaintiff and Defendants made, influenced, or participated in the decision to prosecute.

136.     There was a lack of probable cause for the prosecution.

137.     As a consequence of this legal proceeding, Joshua Maxton suffered a deprivation of liberty.  He was deprived of his liberty when he was held in the Hamilton County Justice Center for nearly a year awaiting trial.

138.     The criminal proceeding was resolved in Plaintiff's favor.

## VII.     THIRD CAUSE OF ACTION – MUNICIPAL LIABILITY (42 U.S.C. § 1983)

139.     Defendant City of Cincinnati failed to provide an adequate policy to guide Defendants Gramke and Hilbert and the Cincinnati Police Department to ensure CODIS hits and exculpatory

evidence are transmitted to lead investigators and shared with prosecutors and the attorneys for criminal defendants.

140.     The City of Cincinnati has a policy, practice and custom of not timely sharing exculpatory DNA evidence with prosecutors.

141.     Defendant City of Cincinnati failed to adequately train and supervise Defendants Gramke and Hilbert and the Cincinnati Police Department in the proper disclosure of DNA evidence, including CODIS hits, and exculpatory evidence.

142.     Defendant City of Cincinnati's rules, regulations, customs, policies, practices, usages, procedures, inadequate training and supervision, and ratification of Defendants Gramke and Hilbert were caused by the City's deliberate indifference, were all inadequate and unreasonable, caused Plaintiff's injuries, and were the moving force behind the constitutional deprivations suffered by Plaintiff.

## VIII.     FOURTH CAUSE OF ACTION – ABUSE OF PROCESS

143.     A legal proceeding was set in motion properly and with probable cause when Plaintiff was originally arrested for the murder of Robin Pearl on June 15, 2015.

144.     When Defendants continued to incarcerate Plaintiff after the loss of probable cause and failed to disclose exculpatory evidence, they perverted this process in an attempt to accomplish an ulterior purpose for which it was not designed.

145.     Direct damage has resulted from the wrongful use of process because Plaintiff was incarcerated for months without probable cause.

## IX.     FIFTH CAUSE OF ACTION – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

146.     Defendants knew or should have known that their actions would result in serious emotional distress to Plaintiff.

25

147. Defendants' conduct, intentionally continuing to incarcerate an innocent man without probable cause, was extreme and outrageous and utterly intolerable in a civilized community.

148. Defendants' conduct was the proximate cause of Plaintiff's psychic injury.

149. The mental anguish Plaintiff suffered was serious, severe, and debilitating.

## X.    JURY DEMAND

150. Plaintiffs request a jury trial on all claims triable to a jury.


## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court award:

A.  Compensatory damages in an amount to be shown at trial;

B.  Punitive damages against the Defendants in their individual capacity (not against the City of Cincinnati) in an amount to be shown at trial;

C.  Costs incurred in this action and reasonable attorney fees under 42 U.S.C. § 1988;

D.  Prejudgment interest; and

E.  Equitable relief against the City of Cincinnati to enjoin it from continuing unconstitutional policies, training, and supervision;

F.  Such other and further relief as this Court may deem just and proper.

Respectfully Submitted,

/s/ Jennifer L. Branch
Jennifer L. Branch (0038893)
Trial Attorney for Plaintiff
M. Caroline Hyatt (0093323)
Attorney for Plaintiff
Gerhardstein & Branch, Co LPA
441 Vine Street, Suite 3400
Cincinnati, Ohio 45202
(513) 621-9100 Phone
(513) 345-5543 Fax

jbranch@gbfirm.com
chyatt@gbfirm.com

/s/ Nina Morrison
Nina Morrison
*Appearing Pro Hac Vice*
Attorney for Plaintiff
Senior Staff Attorney
Innocence Project, Inc.
40 Worth St., Suite 701
New York, NY 10013
(212) 364-5357 (direct tel.)
(212) 364-5341 (fax)
nmorrison@innocenceproject.org

## CERTIFICATE OF SERVICE

I hereby certify that on June 8, 2018, a copy of the foregoing pleading was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.  I further certify that a copy of the foregoing pleading and the Notice of Electronic Filing has been served by ordinary U.S. mail and email upon all parties for whom counsel has not yet entered an appearance electronically, including:

/s/Jennifer L. Branch

Trial Attorney for Plaintiff